No. 23-1320

## UNITED STATES COURT OF APPEALS
## FOR THE EIGHTH CIRCUIT

STATE OF ARKANSAS et al.,
Petitioners,

v.

UNITED STATES ENVIRONMENTAL PROTECTION AGENCY et al.
Respondents.

On Petition for Review of an Agency Action
of the United States Environmental Protection Agency

**Petitioners' Motion for Stay of Final Rule**

TIM GRIFFIN
  Arkansas Attorney General

NICHOLAS J. BRONNI
  Arkansas Solicitor General

DYLAN L. JACOBS
  Deputy Solicitor General

ASHER L. STEINBERG
  Senior Assistant Solicitor General

OFFICE OF THE ARKANSAS
  ATTORNEY GENERAL
323 Center Street, Suite 200
Little Rock, Arkansas 72201
(501) 682-2007
dylan.jacobs@arkansasag.gov

INTRODUCTION

This motion seeks a stay of the EPA's disapproval of Arkansas's plan under the Clean Air Act for addressing ozone emissions that travel from Arkansas to its neighbors. In a nutshell, EPA's disapproval rests on Arkansas's inability to predict that EPA would ask it to address one set of emissions, but review the plan for whether it adequately addressed another. Because agencies cannot change the relevant standards after the fact, EPA's disapproval is arbitrary, capricious, and otherwise contrary to law. Moreover, if not stayed, that disapproval will impose irreparable harm on Arkansas, its economy, and its citizens.

To prepare its state implementation plan (SIP) addressing ozone emissions, Arkansas relied on EPA modeling that told the state where, and in what amount, Arkansas emissions traveled, and EPA guidance that told the state it likely need only address flows above 1 part per billion (ppb). Addressing what EPA told it to, Arkansas submitted its SIP in 2019.

EPA did not act on that SIP until it proposed to disapprove it in 2022. In doing so, EPA said Arkansas had failed to address a new set of emissions. To justify that, just 13 days before EPA proposed to disapprove Arkansas's SIP, it released new, never-before-seen projections suggesting that Arkansas didn't contribute to an ozone problem in Michigan (as the previous model suggested) but to an ozone problem in Texas. But even that wasn't enough to justify disapproving

i

Arkansas's SIP because post-comment-period remodeling showed those Texas contributions largely fell below 1 ppb. So EPA announced that the relevant threshold wasn't 1 ppb, but really 0.7 ppb. On that basis, it disapproved Arkansas's SIP on February 13, 2023.

That action was arbitrary and capricious. EPA may not give States one set of projections to write their plans with, then evaluate their plans under an entirely different set. And even if it could, EPA has said for decades that it wouldn't; instead, States would be evaluated under the modeling they had when their plans were written. EPA departed from that longstanding policy without explanation, and that alone makes its action arbitrary. EPA also may not advise States that they could use one threshold for emissions and then switch to a more demanding one.

And absent an immediate stay of that lawful action, EPA will be empowered to impose a federal implementation plan that overrides the Clean Air Act's system of cooperative federalism and impose millions of dollars in costs on Arkansas and its citizens—all to achieve comparable emissions.

This Court should stay EPA's disapproval.

# TABLE OF CONTENTS

Introduction ............................................................................................... i

Table of Contents ..................................................................................... iii

Statement .................................................................................................. 1

    A. Statutory Background ...................................................................... 1

    B. Arkansas's submission and EPA's disapproval. ................................. 2

    1. EPA's pre-submission guidance ........................................................ 2

    2. Arkansas's SIP .................................................................................. 4

    3. EPA's disapproval ............................................................................ 5

Argument .................................................................................................. 10

    I. Arkansas is likely to succeed on the merits. ................................... 10

    A. EPA's modeling switch was arbitrary and capricious. ..................... 10

    B. EPA's recantation of its 1 ppb guidance was arbitrary and
       capricious. ...................................................................................... 17

    II. The remaining stay factors favor Arkansas. .................................. 19

Conclusion ............................................................................................... 22

Certificate of Compliance ....................................................................... 23

Certificate of Service .............................................................................. 24

Appellate Case: 23-1320    Page: 4    Date Filed: 03/31/2023 Entry ID: 5260845

## TABLE OF AUTHORITIES

### Cases

*Encino Motorcars, LLC v. Navarro*, 579 U.S. 211 (2016) .............................. 15, 18

*EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489 (2014) ..................... 8, 11

*FCC v. Fox Television Stations, Inc.*, 556 U.S. 502 (2009) ............................ 15, 18

*Iowa Utils. Bd. v. FCC*, 109 F.3d 418 (8th Cir. 1996) .................................... 10, 20

*Kreis v. Sec'y of the Air Force*, 406 F.3d 684 (D.C. Cir. 2005) ............................ 15

*Nken v. Holder*, 556 U.S. 418 (2009) ............................................................... 20

*North Dakota v. EPA*, 730 F.3d 750 (8th Cir. 2013) ............................................ 1

*Sierra Club v. EPA*, 358 F.3d 296 (D.C. Cir. 2004) ........................................ 11-14

*Texas v. EPA*, 829 F.3d 405 (5th Cir. 2018) ................................................... 19-20

*Wisconsin v. EPA*, 938 F.3d 303 (D.C. Cir. 2019) ............................................... 9

### Statutes

42 U.S.C. 7410 ..................................................................................... *passim*

42 U.S.C. 7502(c)(3) .................................................................................. 16

### Regulations

*Approval and Promulgation of Air Quality Implementation Plans; District of Columbia, Maryland, Virginia; Post 1996 Rate-of-Progress Plans and One-Hour Ozone Attainment Demonstrations*
68 Fed. Reg. 19,106 (Apr. 17, 2003) .......................................................... 11, 14

*Determination of Failure To Attain the One-Hour Ozone Standard by 2007, Determination of Current Attainment of the One Hour Ozone Standard, Determinations of Attainment of the Eight-Hour Ozone Standards for the New York-Northern New Jersey-Long Island Nonattainment Area in Connecticut, New Jersey and New York*
69 Fed. Reg. 21,717 (Apr. 22, 2004) .......................................................... 13, 15

*National Ambient Air Quality Standards for Ozone*
80 Fed. Reg. 65,292 (Oct. 26, 2015) ............................................................... 2

Appellate Case: 23-1320     Page: 5     Date Filed: 03/31/2023 Entry ID: 5260845

*Approval and Promulgation of Air Quality State Implementation Plans; California; San Joaquin Valley; Moderate Area Plan for the 2006 PM2.5 NAAQS,* 81 Fed. Reg. 59,876 (Aug. 31, 2016)................................13, 14

*Partial Approval and Partial Disapproval of Air Quality Implementation Plans; California; San Joaquin Valley Serious Area and Section 189(d) Plan for Attainment of the 1997 Annual PM2.5 NAAQS* 86 Fed. Reg. 67,329 (Nov. 26, 2021) ................................................................13

*Official Release of EMFAC2021 Motor Vehicle Emission Factor Model for Use in the State of California,* 87 Fed. Reg. 68,483 (Nov. 15, 2022) ......................................................... 13, 18

v

Appellate Case: 23-1320    Page: 6    Date Filed: 03/31/2023 Entry ID: 5260845

## A.      Statutory Background

The Clean Air Act is a "cooperative federalism" statute.  *North Dakota v. EPA*, 730 F.3d 750, 757 (8th Cir. 2013).  It "sets forth a basic division of labor" between the States and the federal government.  *Id.*  The EPA sets air quality standards—NAAQS, short for national ambient air quality standards—that set maximum levels for major pollutants in the air.  42 U.S.C. 7409.  The States, in turn, are assigned "the primary role of determining the appropriate pollution controls within their borders."  *North Dakota*, 730 F.3d at 760-61.  Under the Act, they exercise that role by preparing state implementation plans, or SIPs.  42 U.S.C. 7410.  EPA cannot impose its own federal implementation plan, or FIP, unless a State fails to submit a SIP or submits one that fails to satisfy the statute.  *Id.*, 7410(c).  And if a State submits a deficient SIP, EPA may give the State up to two years to correct the deficiency before imposing a FIP.  *Id.*

One of the ways in which the Clean Air Act implements the NAAQS is through the good-neighbor provision.  It requires SIPs to contain provisions that prevent the State's emissions from "contribut[ing] significantly to nonattainment in, or interfer[ing] with maintenance by, any other State" with respect to the various NAAQS.  *Id.* 7410(a)(2)(D)(i)(I).  The Act does not define significant contribution.  As EPA explained in the rule Arkansas challenges here, it reviews

1

compliance with that standard under a four-step framework.  First, it identifies sites throughout the country that it projects will have difficulty satisfying the NAAQS. 88 Fed. Reg. 9,336, 9,338 (Feb. 13, 2023).  Second, through modeling, it estimates state emission contributions to those sites and evaluates their significance.  *Id.* Third, it assesses whether States could achieve cost-effective emissions reductions that would eliminate those contributions.  *Id.* at 9,442.  Finally, it evaluates a SIP's emissions reductions measures, if any.  *Id.* at 9,443.

### B.    Arkansas's submission and EPA's disapproval.

On October 1, 2015, EPA announced it was lowering the ozone NAAQS, reducing the maximum allowable level from 75 parts per billion (ppb) to 70.  80 Fed. Reg. 65,292 (Oct. 26, 2015).  That action triggered a three-year deadline for Arkansas to revise its ozone SIP—and particularly to estimate whether it made significant contributions to non-attainment of the new NAAQS in downwind states.  42 U.S.C. 7410(a)(1), (a)(2)(D)(i)(I).

### 1.    EPA's pre-submission guidance.

On March 27, 2018, just six months before SIPs were due, EPA shared what were then its most recent "contribution modeling data for 2023 to assist states in evaluating their impact on potential downwind air quality problems for the 2015 ozone NAAQS[.]"  88 Fed. Reg. at 9,339.  That modeling of states' contributions "project[ed]" measurements from 2009 to 2013 forward "to 2023."  *Information on*

2

*the Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards under Clean Air Act Section 110(a)(2)(D)(i)(I)* at 4 (Mar. 27, 2018); App'x 004. In the new guidance, EPA did not instruct States they were required to use its new modeling but said they could use it if they wished. App'x 006.

According to that modeling, out of all the sites in the country projected to potentially fall above the 70-ppb ozone standard in 2023, Arkansas would contribute 1 ppb of ozone to just one—Allegan County, Michigan. 87 Fed. Reg. 9,798, 9,804 (Feb. 22, 2022). EPA projected it would contribute 1% of the standard—0.7 ppb out of the maximum allowable 70—to only three more projected non-attaining sites in Texas. *Id.*

After EPA issued those projections, and a month before SIPs were theoretically due, it "provide[d] recommendations for states" about "what thresholds may be appropriate for use" in determining whether their contributions to downwind States were significant or not. *Analysis of Contribution Thresholds for Use in Clean Air Act Section 110(a)(2)(D)(i)(I) Interstate Transport State Implementation Plan Submissions for the 2015 Ozone National Ambient Air Quality Standards*, at 1 (Aug. 31, 2018); App'x 021. EPA analyzed how much upwind contributions to nonattainment would be captured if States used a 1 ppb threshold instead of a 1%-of-the-NAAQS, or 0.7 ppb, threshold. EPA found that

3

permitting states to use 1 ppb would capture just 7% less of the total upwind contribution that a 1% threshold would. App'x 024. On that basis, EPA advised States the two thresholds were "generally comparable" and that "it may be reasonable and appropriate for states to use a 1 ppb contribution threshold." *Id.*

### 2. Arkansas's SIP.

Armed with this late-breaking guidance and data, Arkansas set about preparing its SIP—a time-consuming process that under state law required rulemaking and gubernatorial and legislative consultation. On October 4, 2019, Arkansas submitted its SIP to EPA. App'x 029. In that SIP, Arkansas concluded it was not a significant contributor to downwind nonattainment in any State.

First, Arkansas agreed with EPA that a 1 ppb threshold was a reasonable screen for significance. App'x 039. That left just one non-attaining site in the country to which EPA projected Arkansas would contribute significantly—Allegan County, Michigan. In 82 pages of painstaking technical analysis of air flows between Arkansas and that faraway county, the Arkansas Division of Environmental Quality (ADEQ) concluded that Arkansas did not significantly contribute to ozone levels there. App'x 042-123. Most tellingly, on days with elevated ozone levels in Allegan County from 2008 to 2017, ADEQ found only one year that air from Arkansas reached Allegan County on more than three days. App'x 081. Simply put, "there [wa]s not a consistent or persistent pattern of air

flow through Arkansas to Allegan County." *Id.* Accordingly, ADEQ concluded that no additional controls were needed to satisfy Arkansas's good-neighbor obligations under the new ozone NAAQS. App'x 123.

### 3. EPA's disapproval

On November 7, 2019, the EPA advised Arkansas it had determined its SIP was complete. App'x 253. That determination triggered a one-year deadline for EPA to approve or disapprove Arkansas's SIP. 42 U.S.C. 7410(k)(2). Instead of acting in a year, EPA took over two, ultimately proposing to disapprove Arkansas's SIP on February 1, 2022. 88 Fed. Reg. at 9,811, 9,835. And as the deadline slipped, EPA kept changing its model for projecting States' contributions to others' ozone.

EPA first released the model it would use to evaluate SIPs, "2016v2," on September 21, 2021, nearly two years after Arkansas submitted its SIP. *2015 Ozone NAAQS Interstate Transport Disapprovals — Response to Comment (RTC) Document*, at 84; App'x 337. As the model's name suggests it used data centered around 2016 (the years 2014 to 2018) instead of using data from 2009 to 2013, like the modeling in EPA's 2018 guidance to States. 88 Fed. Reg. at 9,339. But critically, EPA did not state at that time that it would use 2016v2 in rulemaking on the new NAAQS. Nor did it give States the all-important *results* of the model— estimated contributions of ozone to downwind States.

5

Finally, on January 19, 2022, it released those results on its website, *id.*, with the statement that, "[w]hile these data do not reflect any policy or regulatory decisions, EPA expects to use this information in upcoming rulemaking actions, including ozone transport actions." Environmental Protection Agency, *2016v2 Platform*, https://www.epa.gov/air-emissions-modeling/2016v2-platform.

Expectations became reality just 13 days later when, on February 1, 2022, EPA proposed to disapprove Arkansas's SIP based on its fresh-off-the-shelf projections. EPA said that ADEQ's painstaking analysis of Arkansas's contributions to Allegan County was beside the point; EPA *now* projected that Allegan County would "be attaining and is not expected to have difficulty maintaining the standard in 2023." 87 Fed. Reg. at 9,808. Instead, EPA projected that Arkansas would contribute 1 ppb to four sites at risk of nonattainment in Texas, and just over 1% of the NAAQS, 0.76 ppb, to a fifth Texas site. *Id.* None of these sites had previously been identified as receiving 1 ppb of ozone from Arkansas. And only one had even been identified in the 2018 modeling as an Arkansas contribution under the more stringent 1% threshold EPA previously suggested States could depart from. *Id.* at 9,804.

EPA acknowledged that its new modeling "identified different receptors and linkages" than its old modeling had. *Id.* at 9,808. Nevertheless, EPA's determination of Arkansas's linkage was solely "based on the EPA model 2016v2

6

results for 2023." *Id.* And though it was unnecessary to its conclusion, EPA now insisted the more stringent 1% screening threshold was the appropriate one—even though it acknowledged that under its new modeling, the difference in coverage between a 1% and 1 ppb threshold was even slighter than the August memorandum had forecast. *Id.* at 9,807 ("[T]he amount lost is five percent."). It claimed that its prior guidance had merely advised States that a 1 ppb threshold may be appropriate under "state-specific circumstances." *Id.* at 9,806.

Arkansas submitted extensive comments to EPA objecting to its proposed disapproval. Those comments chiefly objected to EPA's reliance on its eleventh-hour modeling. ADEQ, *Arkansas Division of Environmental Quality Comments* at 3-5, 12 (Apr. 22, 2022); App'x 752-754,761. As Arkansas pointed out, new modeling will often yield different results, App'x 754, and unless EPA relies on the modeling available to States when they drafted their SIPs, States cannot predict what the relevant modeling results will be, App'x 774. Moreover, the two-month comment period did not afford States adequate time to respond to EPA's new forecasts. App'x 768. Arkansas also objected to EPA's recantation and recasting of its guidance that a 1 ppb threshold was a reasonable threshold. App'x 762-763.

On February 13, 2023, EPA finalized its disapproval of Arkansas's SIP. 88 Fed. Reg. at 9,355. Rather than recede from its reliance on post-submission modeling, EPA doubled down, "construct[ing] a [new] emissions platform" in

7

response to comments. *Id.* at 9,339. Under that model, EPA's shift to a 1% threshold, previously gratuitous, became all but outcome-determinative. Of the six linkages between Arkansas and at-risk-of-nonattainment sites EPA identified, *id.* at 9,355, Arkansas contributed over 1 ppb of ozone to just one; the other contributions were only captured by the more demanding 0.7 ppb threshold. *See* Envtl. Prot. Agency, *Air Quality Modeling Technical Support Document: 2015 Ozone NAAQS SIP Disapproval Final Action*, App'x C, C-2–3.[1] And the new modeling predicted another contribution Arkansas wasn't informed of until the final rule. *Id.* at C-2.

In response to numerous comments, including Arkansas's, faulting EPA's reliance on post-submission data and its refusal to allow States to correct their SIPs before disapproving them and proposing a FIP, EPA answered that under the Supreme Court's decision in *EPA v. EME Homer City Generation*, it had no obligation "to issue guidance or quantify" States' contributions at all. 88 Fed. Reg. at 9,363; *id.* at 9,364. Further, citing only a case that held EPA cannot *deny* a SIP on the basis of onetime nonattainment that improved post-submission, EPA insisted it could "hardly be the case that the EPA is prohibited from [disapproving

---

[1] https://www.epa.gov/system/files/documents/2023-02/AQ%20Modeling%20TSD_Final%20Action%20%281%29.pdf.

Appellate Case: 23-1320     Page: 14     Date Filed: 03/31/2023 Entry ID: 5260845

SIPs] using the best information available to it at the time it takes such action." *Id.* at 9,366 (citing *Wisconsin v. EPA*, 938 F.3d 303, 322 (D.C. Cir. 2019)).

With respect to the threshold question, EPA announced it was "finalizing its proposed approach of consistently using a 1 percent" threshold. *Id.* at 9,371. Yet two pages later, it denied it had "imposed a requirement that states must use a 1 percent" threshold, which even it acknowledged "would reflect a change in position from the August 2018 memorandum." *Id.* at 9,373. Instead, it claimed, it had merely determined that no State had "made a sufficient showing that the use [of 1 ppb] is justified." *Id.* EPA said this mere finding of a lack of justification was consistent with the August 2018 guidance, which it continued to read as requiring state-specific justification for a 1 ppb threshold. *Id.* It alternatively reasoned that even if it had changed its position, States lacked reliance interests in the memorandum because they had not "incurred any compliance costs based on" it, or "invested much . . . resources in developing state-specific arguments in support of a 1 ppb threshold." *Id.*

On March 15, 2023, EPA finalized its FIP for Arkansas. Arkansas petitioned for agency reconsideration on March 21, 2023, and it now asks this Court to stay the disapproval pending this Court's review.

9

This Court considers four factors in deciding whether to grant a stay: (1) the likelihood that the movant will prevail on the merits; (2) the likelihood that the movant will suffer irreparable harm absent a stay; (3) the prospect of harm to others if a stay is granted; and (4) the public interest. *See Iowa Utils. Bd. v. FCC*, 109 F.3d 418, 423 (8th Cir. 1996).

## I.    Arkansas is likely to succeed on the merits.

This Court is likely to hold that EPA's disapproval of Arkansas's SIP was arbitrary and capricious for two reasons.  First, EPA evaluated Arkansas's SIP under a different set of projections than the ones it advised Arkansas to use in writing its SIP—making it impossible for Arkansas to obtain approval, and departing from decades of EPA practice that held States to only the EPA modeling in existence when SIPs were written.  Second, it evaluated the SIP under a different contribution threshold than the one it told Arkansas was likely reasonable, claiming that it was Arkansas's burden to prove EPA's own guidance right.

### A.    EPA's modeling switch was arbitrary and capricious.

EPA's defense of its post-SIP-submission model swap is refreshingly honest.  Though the change in data may have misled States, it doesn't matter, because EPA was not "required to . . . quantify individual states' level of significant contribution" at all.  88 Fed. Reg. at 9,363.  And "some ideas" about

10

States' obligations, *id.*, even if later overwritten, are more than what EPA was obligated to provide. *Id.*

EPA's *premise* is correct. The Supreme Court has held the Clean Air Act "does not require EPA to furnish upwind States with information of any kind about their good neighbor obligations." *EPA v. EME Homer City Generation, L.P.*, 572 U.S. 489, 509 (2014). If EPA chose, it could simply make States guess at the criteria and data EPA will use. But EPA's conclusion doesn't follow. For if EPA *does*—as it did with the now-discarded 2009-13 modeling—choose to share "contribution modeling data . . . to assist states in evaluating their" contributions, 88 Fed. Reg. at 9,339, it must use that data when States rely on it.

That is the teaching of *Sierra Club v. EPA*, 358 F.3d 296 (D.C. Cir. 2004) (Garland, J.). There, several States submitted SIPs that used an emissions model EPA had replaced "one month *before* the States submitted their SIPs," but "long after" they were "prepared." *Id.* at 308 (emphasis added). EPA approved the plans over a year later, explaining that "its policy was not to 'require states that have already submitted SIPs or will submit SIPs shortly after [the new model's] release to revise th[o]se SIPs simply because a new motor vehicle emissions model is now available.'" *Id.* (quoting 68 Fed. Reg. 19,106, 19,121 (Apr. 17, 2003)). Sierra Club sued, arguing EPA could not approve plans that "relied on an outdated emissions model." *Id.* Upholding EPA's action, the D.C. Circuit not only held

11

that EPA's course was reasonable, but strongly suggested Sierra Club's preferred approach was unreasonable, writing: "To require states to revise completed plans every time a new model is announced would lead to significant costs and potentially endless delays in the approval processes." *Id.*

That is exactly right. If EPA shared no modeling, States could attempt to make their own. But if EPA releases modeling on which States rely in preparing their plans, only for EPA to rely on a different model in reviewing them, the opportunity the Act affords States to submit their own plans in the first instance becomes a futile gesture. EPA's action here proves the point. After it announced its new modeling results, it disapproved 19 States' SIPs in full, and disapproved two States' SIPs in part, 88 Fed. Reg. at 9,336. By contrast, in arguing its updates had "not uniformly been used to disapprove SIPs," it only pointed to two exceptions. *Id.* at 9,364. That failure rate is unsurprising, as States addressed their plans to an almost entirely different set of projected contributions than that on which EPA relied.

EPA's action on Arkansas's SIP illustrates how this happened. Arkansas believed the primary contribution its SIP needed to address was to Allegan County, Michigan, and devoted immense resources to demonstrating it was not a significant contributor to that locale's ozone problem. Then EPA did new modeling, announced Allegan County was "not expected to have difficulty maintaining the

standard," 87 Fed. Reg. at 9,808, determined that Arkansas contributed to four previously unidentified sites in Texas, and on that ground proposed disapproval. Such guidance is much worse than no guidance at all.

But even if it were reasonable in theory for EPA to switch models post-submission, it would still be unreasonable considering EPA's past practice. For as the EPA action upheld in *Sierra Club* illustrates, until the SIP denial at issue here, EPA had a "longstanding policy" of only "requiring states to use the most current emission estimate models *available at the time of SIP development*." 81 Fed. Reg. 59,876, 59,878 n.15 (Aug. 31, 2016) (emphasis added).

EPA has reiterated that policy again and again over the decades. As recently as late 2022, it said it "does not require states that have already submitted SIP revisions or will submit SIP revisions shortly after the release of a new model to revise th[o]se SIP revisions simply because a new motor vehicle emissions model is now available." 87 Fed. Reg. 68,483, 68,486 (Nov. 15, 2022). As it explained a year prior, "it would be unreasonable to require a state to revise such a submission after significant work had already occurred." 86 Fed. Reg. 67,329, 67,333 (Nov. 26, 2021). In 2004, it said that "[o]nce a plan has been adopted, EPA does not generally require plan elements such as emissions inventories and attainment demonstrations to be revisited and updated in response to new information." 69 Fed. Reg. 21,717, 21,727 (Apr. 22, 2004). Explaining that policy, it said that

13

evaluating plans "based on information that was not available at the time of submittal would create a moving target that would be impossible to meet." *Id.* Precisely. And in the order upheld in *Sierra Club*, citing its "long established policies and guidance" on "new models," 68 Fed. Reg. at 19,121, it said that "[i]n general, EPA has not required changes to submitted SIPs [due to] changes in factors and methodologies that occur after the SIP is submitted," *id.* at 19,120.

Sometimes the EPA states that policy generally, in terms of any change in emissions models or even any "changes in factors and methodologies." *Id.* Sometimes it states it more narrowly, as a policy about changes in mobile source emissions models. But whether EPA's action here is viewed as a departure from past practice, or only as a decision to treat new ozone contribution modeling differently than it treats new mobile source emission modeling, it is arbitrary.

Viewed as a departure from past practice, EPA's action is plainly arbitrary. EPA not only has advised States for over two decades that it would only hold them to emissions modeling "available at the time of SIP development, 81 Fed. Reg. at 59,878 n.15; it has repeatedly said that to act otherwise would be unreasonable. Now, EPA "disagree[s]" that its evaluation of SIPs "must be limited to the information available to states at the time they made their submissions," 88 Fed. Reg. at 9,366, claiming it "can hardly be the case" that it is prohibited from relying on newer modeling, *id.*

14

Perhaps EPA could justify that shift—even though, as it explained in the past, its new approach "create[s] a moving target that is impossible to meet," 69 Fed. Reg. at 21,727. "But the agency must at least 'display awareness that it is changing position' and 'show that there are good reasons for the new policy.'" *Encino Motorcars, LLC v. Navarro*, 579 U.S. 211, 221 (2016) (quoting *FCC v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009)). Here, EPA did not acknowledge it was changing approach, much less give reasons for the change. Instead, it simply declared it was inconceivable that it would act in the way it had acted for over 20 years.

EPA may claim its many broad statements about post-submission modeling only concerned changes in *mobile* source emissions modeling. But a distinction between new mobile source emissions modeling and new ozone transport modeling would be irrational. "[A]n agency must treat similar cases in a similar manner unless it can provide a legitimate reason for failing to do so." *Kreis v. Sec'y of the Air Force*, 406 F.3d 684, 687 (D.C. Cir. 2005). Whether EPA holds States to post-submission mobile source emissions models or post-submission ozone emissions models, the costs and benefits are the same—making SIPs

15

unapprovable and SIP preparation futile in exchange for what EPA hopes is marginally more accurate modeling.[2]

Indeed, in distinguishing its action in *Sierra Club* in response to commenters, EPA's only distinction was that there the Clean Air Act and EPA regulations required States to use "the latest emissions model" in fashioning plans to cure their own nonattainment, while the Act's good-neighbor provisions do not. App'x 314. But the fact that the Clean Air Act specifically requires nonattaining States to prepare a "*current* inventory of actual emissions" in their SIPs, 42 U.S.C. 7502(c)(3) (emphasis added), only makes it *harder* to justify EPA's decision to permit States to use mobile source emissions models that are superseded after SIP submission, or even shortly before SIP submission. By contrast, as EPA pointed out, no statute requires a "current" ozone transport model in a SIP.

Besides, any distinction between the two types of modeling ignores that one is an ingredient of the other. Indeed, when EPA moved to 2016v2, one of the main updates was "updated onroad mobile emissions" from a new mobile source emissions model. 88 Fed. Reg. at 9,339. It makes no sense to not hold States to

---

[2] Accurate mobile source emissions modeling is scarcely less critical to writing a valid SIP than accurate ozone transport modeling. Though States (except California) cannot regulate mobile source emissions, the quantity of mobile source emissions is an essential variable in a SIP; States can't calculate the total level of a pollutant without it, nor determine how much they must reduce emissions from the sources they *can* regulate.

Appellate Case: 23-1320    Page: 22    Date Filed: 03/31/2023 Entry ID: 5260845

the newest mobile source modeling, but to hold them to the newest standards based on that modeling.

## B. EPA's recantation of its 1 ppb guidance was arbitrary and capricious.

EPA's disapproval of Arkansas's SIP is arbitrary and capricious for a second reason. After advising States in 2018 that a 1 ppb screening threshold was likely appropriate, it claimed 0.7 ppb was the appropriate threshold and disapproved Arkansas's SIP on the basis of six contributions that, with only one exception, were expected to fall below 1 ppb. EPA said it could make that bait-and-switch for two reasons. First, States did not rely on the 2018 guidance, because they did not incur compliance costs under it or invest resources in making "state-specific arguments in support of a 1 ppb threshold." 88 Fed. Reg. at 9,373. Second, the States' reading of the guidance was merely "a misunderstanding"; in reality, it had always required state-specific justifications of 1 ppb. *Id.* Both of these rationalizations are unavailing.

Beginning with reliance, EPA's suggestion that Arkansas lacks "a legitimate reliance interest," *id.*, because it did not make state-specific arguments for 1 ppb in reliance on its guidance is a non sequitur. Arkansas relied on EPA's guidance in the most fundamental way—by basing its entire SIP submission on the premise that *it didn't have to* justify 1 ppb, and that absent contributions over 1 ppb it would have an approvable plan. Thus, Arkansas expended immense agency

17

modeling resources on showing that the one contribution EPA projected *would* exceed 1 ppb was a chimera, while confidently resting on EPA's guidance that given the miniscule additional amounts of ozone captured by a 0.7 ppb threshold, it was reasonable and appropriate to use 1 ppb. And to the extent EPA relies on the claim that "guidance memoranda are not binding," *id.*, that too is besides the point. Guidance memoranda may not bind, but agencies act arbitrarily when they depart without reasoning from even non-binding guidance that has induced reliance. *See Encino Motorcars*, 579 U.S. at 217 (reliance on opinion letters and field operations manuals); *Fox Television*, 556 U.S. at 512, 517, 521 (reliance on staff rulings and FCC dicta).

Turning to EPA's interpretation of the guidance, it claims it provided that a 1 ppb threshold must be "justified" under "state-specific circumstances," 87 Fed. Reg. at 9,806, even as it acknowledged that "nearly all" of the States that used a 1 ppb threshold, read it more broadly, 88 Fed. Reg. at 9,373 & n.312-22. The reason for this near-universal "misunderstanding," *id.* at 9,373, is that it's EPA that misunderstands what its guidance said. EPA performed a comprehensive analysis that showed a 1 ppb threshold would result in emissions reductions that were "only slightly lower" than an 0.7 ppb threshold. App'x 024. On that ground it advised States it "may be reasonable and appropriate for states to use a 1 ppb contribution

Appellate Case: 23-1320    Page: 24    Date Filed: 03/31/2023 Entry ID: 5260845

threshold . . . in developing their SIP revisions," *id.*—guidance it described as "recommendations for states," App'x 021.

EPA highlights different language. It notes the guidance also said that it "may not apply to the facts and circumstances underlying a particular SIP," 88 Fed. Reg. at 9,372 (quoting App'x 021), and that "EPA and air agencies should consider whether the recommendations in this guidance are appropriate for each situation," *id.* at 9,373 (quoting App'x 021). But to read that as requiring a state-specific justification of a 1 ppb threshold turns the guidance on its head. Instead, what the guidance straightforwardly says is that there may be state-specific reasons to *depart* from the guidance, not that States had to justify following the EPA's own guidance to the EPA. EPA unexpectedly turned a burden on *it* to depart from its guidance in individual cases into a burden on the States to prove the EPA's guidance was right. And it did so without acknowledging that it was rewriting the guidance, much less justifying the rewrite. Instead, EPA's disapproval found the amount of contributions lost under a 1 ppb threshold was even less than the 2018 guidance concluded—just "5 percent." 88 Fed. Reg. at 9,374.

## II. The remaining stay factors favor Arkansas.

Arkansas will be irreparably harmed absent a stay. To begin with, allowing the SIP disapproval—and through it, EPA's FIP—to take effect "would disrupt the system of cooperative federalism enshrined in the Clean Air Act." *Texas v. EPA*,

19

829 F.3d 405, 433 (5th Cir. 2018). Further, the SIP disapproval is necessary to
EPA's imposing a FIP. And that FIP will impose compliance costs on key
Arkansas industries—potentially millions of dollars prior to the time a decision on
Arkansas's petition could be entered by the Court—that are unrecoverable, which
"does qualify as irreparable harm." *Iowa Utils. Bd.*, 109 F.3d at 426; *see also
Texas*, 829 F.3d at 433 ("[C]omplying with a regulation later held invalid almost
*always* produces the irreparable harm of nonrecoverable compliance costs."). And
though EPA may claim that FIP compliance deadlines do not take effect in the
immediate term, that would ignore the costs of engineering, as well as securing the
needed manufacturing in the post-COVID-19 marketplace.

The third and fourth factors, which "merge when the Government is the
opposing party," *Nken v. Holder*, 556 U.S. 418, 435 (2009), consider the prospect
of harm to others and the public interest. Any harm from delay in implementation
of the FIP is slight. Arkansas's projected contributions of a fraction of 1 ppb to a
handful of sites are unlikely to make or break those sites' attainment of the 70 ppb
NAAQS, and the lion's share of the FIP's projected emissions reductions do not
kick in until 2026, further mitigating any harm there may be. Indeed, EPA's own
action belies any claim of harm from delay; if time were of the essence, it would
not have taken over three years to disapprove Arkansas's SIP and impose a FIP.

And the public has a strong interest in maintaining the Clean Air Act's regime of state regulatory primacy.

Appellate Case: 23-1320     Page: 27     Date Filed: 03/31/2023 Entry ID: 5260845

## CONCLUSION

This Court should grant the stay motion.

Dated: March 31, 2023

Respectfully Submitted,

TIM GRIFFIN
  Arkansas Attorney General

NICHOLAS J. BRONNI
  Arkansas Solicitor General
DYLAN L. JACOBS
  Deputy Solicitor General
ASHER L. STEINBERG
  Senior Assistant Solicitor General
Arkansas Attorney General's Office
323 Center Street, Suite 200
Little Rock, AR 72201
Phone:   (501) 682-2007
Dylan.Jacobs@ArkansasAG.gov

*Attorneys for the State of Arkansas and Arkansas Department of Energy and Environment*

22

## CERTIFICATE OF COMPLIANCE

I certify that this brief complies with the type-volume limitation of Fed. R. App. P. 29(a)(5) because it contains 5,174 words, excluding the parts exempted by Fed. R. App. P. 32(f).

I also certify that this brief complies with the requirements of Fed. R. App. P. 32(a)(5)-(6) because it has been prepared in 14-point Times New Roman font, using Microsoft Word.

I further certify that this PDF file was scanned for viruses, and no viruses were found on the file.

/s/ *Dylan L. Jacobs*
Dylan L. Jacobs

Appellate Case: 23-1320    Page: 29    Date Filed: 03/31/2023 Entry ID: 5260845

**CERTIFICATE OF SERVICE**

I certify that on March 31, 2023, I electronically filed the foregoing with the Clerk of Court using the CM/ECF system, which shall send notification of such filing to any CM/ECF participants.

/s/ *Dylan L. Jacobs*
Dylan L. Jacobs

Appellate Case: 23-1320    Page: 30    Date Filed: 03/31/2023 Entry ID: 5260845